Margot Wilensky (MW-3181)
HAWORTH ROSSMAN & GERSTMAN, LLC
45 Broadway, 21st Floor
New York, New York 10006
Telephone: (212) 952-1100
Facsimile: (212) 952-1110

*Attorneys for Plaintiff*
*High 5 Games, LLC*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

HIGH 5 GAMES, LLC,

<table>
<tr><td></td><td>Plaintiff,</td><td>Civil Action No.:</td></tr>
<tr><td>v.</td><td></td><td>**JURY TRIAL<br>DEMANDED**</td></tr>
<tr><td>IGT and DOUBLE DOWN INTERACTIVE, LLC,</td><td></td><td></td></tr>
<tr><td></td><td>Defendants,</td><td></td></tr>
</table>

-------------------------------------------------------------X

## COMPLAINT

Plaintiff, HIGH FIVE GAMES, LLC ("H5G"), by it attorneys, Haworth Rossman & Gerstman, LLC, as and for its Complaint against IGT and Double Down Interactive, LLC hereby alleges as follows:

## NATURE OF THIS ACTION

1.      H5G pursues this action against IGT for damages seeping from (i) Breach of contract; (ii) Breach of the implied covenant of good faith and fair dealing; (iii) Unjust Enrichment; and declaratory judgment based on IGTs (iv) Invalidity of Copyright Registration for GOLDEN GODDESS and DA VINCI DIAMONDS; and IGT's (v) Tortious interference with H5G's

1

prospective business relations; and as against Double Down Interactive, LLC for (vi) Tortious interference with contractual relations, and (vii) Tortious interference with H5G's prospective business relations.

2.      This action arises from:

(a) IGT's material breach of the 2016 Settlement Agreement (the "Settlement Agreement") entered into between IGT and H5G, as IGT has failed to comply with various provisions therein, including Sections 3(a) *et seq.*, 9(a) and 9(f).  *See 2016 Settlement Agreement, Ex. A.*

(b) IGT's breach of its implied covenant of good faith and fair dealing to H5G that arises from the Settlement Agreement, where IGT issued to H5G a broad irrevocable license to use certain intellectual property for valuable consideration, and then attempted to revoke, and constructively revoked, said irrevocable license in favor of issuing a subsequent exclusive license for the same intellectual property to H5G's competitor and IGT-progeny Double Down Interactive, LLC.

(c) IGT's tortious interference with H5G's prospective business relations, where IGT knew that H5G had ongoing and/or prospective business relationships with H5G's customers and/or potential customers, that such relationships were, among other things, predicated on the sale and/or use of certain marks and artworks to which IGT granted H5G an irrevocable license, and that IGT interfered with such relationships by its attempt to revoke, and constructive revocation, of said irrevocable license in favor of issuing an exclusive license for the same marks and artwork to H5G's competitor and IGT-progeny Double Down Interactive, LLC.

(d) IGT's Unjust Enrichment based on IGT's grant of exclusive right and license to Double Down Interactive, LLC, of artwork and trademarks of certain casino style slot games, set forth in the 2016 Settlement Agreement at Exhibit C – Exclusive IGT Games, despite H5G's non-exclusive, irrevocable license to use, make, have made, offer for sale, sell, import, reproduce, modify, create derivative works of, publicly display, publicly perform, distribute, and otherwise exploit such artwork and trademarks for any purpose other than use within a casino-style slot game.

(e) IGT's inherently invalid Copyright Registrations, GOLDEN GODDESS GAMING MACHINE, CATS GAMING MACHINE, and DAVINCI DIAMONDS GAMING MACHINE, which do not reflect proper authorship and the scope of the pre-existing works to which IGT has no ownership rights, and which IGT alleges H5G infringed upon in the pending, related action, *IGT v. High 5 Games, LLC*, Docket. No. 1:17-cv-09792, pending in the District Court of the Southern District of New York.

(f) Double Down Interactive, LLC's tortious interference with the 2016 Settlement Agreement, wherein Double Down Interactive LLC had knowledge of the existence of this valid contract between H5G and IGT, and the scope of the terms therein, and with this knowledge, Double Down Interactive, LLC tortiously, knowingly, willfully and intentionally procured a breach of this contract, and as a result, H5G has sustained damages.

(g) Double Down Interactive, LLC's tortious interference with H5G's prospective business relations, wherein Double Down Interactive, LLC knew that H5G had ongoing and/or prospective business relationships with H5G's customers and/or potential customers, that such relationships were, among other things, predicated on the sale and/or use of

3

certain marks and artworks to which IGT granted H5G an irrevocable license, and that Double Down Interactive, LLC induced IGT to interfere with such relationships by inducing IGT to attempt to revoke, and constructively revoke, H5G's irrevocable license to use certain marks and artwork, in favor of Double Down Interactive, LLC and detriment to H5G.

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiff H5G is a Delaware limited liability company with its principal place of business located at One World Trade Center, 58th Floor, New York, New York 10007.

4.      Defendant IGT is a Nevada corporation, with its principal place of business at 6355 South Buffalo Drive, Las Vegas, Nevada 89113.  IGT is a wholly owned subsidiary of International Game Technology PLC.

5.      Defendant Double Down Interactive, LLC is a Washington limited liability company, with its principal place of business at 505 5th Ave South, Suite 310, Seattle, Washington 98104.

6.      Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction as the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000.00.

7.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) as substantial parts of the events giving rise to the claims in this action occurred within this district.

## FACTS COMMON TO ALL CLAIMS

8.      H5G is a world-wide leading creator of high-quality, highly artistic video-style wagering games of chance (a.k.a., slot games), for over 20 years.  H5G generally distributes its games through two primary business models:  (a) third-party distributers of physical slot machine

boxes for land-based casinos, online integrations of H5G's servers and third party real-money gambling online casino operators and content aggregators (who then further sublicense the games) ( collectively "B2B"), and (b) through its own online casinos either for "social" play-for-fun, or its own online casino for real-money gambling.   H5G is widely known, and has won awards, for producing games featuring beautiful graphics with meticulously layered artwork and innovative game play.

9.     For a period of over 15 years, H5G had been providing assets for casino-style slot games to IGT under a number of licensing agreements.  Over the course of H5G's and IGT's relationship, H5G has provided well over 120 top casino-style slot games, and granted IGT rights to use H5G-created assets to create well over 100 more casino-style slot games- some being incredible industry hits.

10.    H5G and IGT first entered into an agreement in early 2000's, and entered into its first exclusive content creation agreement in 2003, whereby H5G could only provide games and game assets to IGT.  Pursuant to that agreement and successive agreements, H5G provided to IGT certain games that it had created and developed for distribution by IGT as hosted on IGT's land-based video-style slot gaming machines.  IGT's exclusivity over H5G's creative content ended with a license agreement in 2012.  During the parties' business relationship, H5G produced many of IGT's highest-grossing casino games, including worldwide best sellers and industry-noted titles such as CATS, DAVINCI DIAMONDS, and GOLDEN GODDESS, among numerous others.  As a result of having rights to distribute H5G Games, IGT catapulted to one of the world's leading distributors of video slot machine games.

11.     IGT has been and is currently one of the world's largest developers and distributors of computerized gaming equipment and software, especially for land-based use, *i.e.* casino style slot games.

*The Now-Terminated 2012 Agreement*

12.     In 2012, H5G and IGT entered into a non-exclusive license agreement whereby H5G was to create casino-style slot games for IGT, but H5G retained the rights to distribute these casino-style slot games in its own social casinos.  Under the 2012 Agreement, IGT selected ten games from the existing portfolio of casino-style slot games between the Parties, including Golden Goddess, DaVinci Diamonds and Cats (the "Selected Games"), to which IGT was given exclusive rights to distribute on its own social casino.

13.     As part of the 2012 Agreement, IGT was granted exclusive rights to the "Distinctive Interface Elements" (*i.e.,* recognizable artwork) and trademarks of the Selected Games for any "Field of Game Play" use.  The Agreement defined "Field of Game Play" as "the nature and type of a traditionally recognized Game found within a casino, being played by an end user of the Game. Fields of Game Play may consist of a slot game, a poker game, a blackjack game, a roulette game, a baccarat game and a craps game. For purposes of clarity, a Field of Game Play shall include the nature of any game having a commonplace wagering application found in most casinos."

14.     Under the 2012 Agreement, H5G was granted the <u>exclusive license rights</u> to use the "Distinctive Interface Elements" and trademarks of the entire portfolio of casino-style slot games (including those of the Selected Games) for any use not in a Field of Game Play.

15.     Under the 2012 Agreement, H5G could have utilized any artwork or trademark of any of the casino-style slot games it had created for IGT, including the Golden Goddess or Cats

slot games, for branding of a social casino – as a social casino falls well-outside the scope of the definition of a Field of Game Play.

*2015 Litigation Arising from IGT's Breach of the 2012 Agreement*

16.     In 2015, H5G filed a Complaint, and subsequently a First Amended Complaint against IGT for breach of the 2012 Agreement.  [Dkt. No. 1:15-cv-02133, filed in the United States District Court, Northern District of Illinois, Eastern Division].  As alleged in the complaint, IGT was making unauthorized derivative games and not paying H5G royalties.  IGT filed counterclaims alleging issues over H5G's use of the trademarks and artwork of Golden Goddess and Cats slot games to promote H5G's social casinos (called "online casinos" in the complaint).  IGT filed a related action in the United States District Court, Northern District of Illinois, Eastern Division, Dkt. No. 1:15-cv-02163.

*The 2016 Settlement Agreement*

17.     IGT and H5G mutually contemplated and agreed to settle the claims at issue in the 2015 litigation and executed a binding Settlement Agreement (the "Settlement Agreement"), effective January 1, 2016, in which H5G accepted a monetary payment amount and a modification of rights of both of the Parties.  *See Ex. A.*

18.     Under Section 9(e) of the Settlement Agreement, H5G was granted very broad, irrevocable, and non-exclusive license rights as follows:

> IGT hereby grants to H5G a non-exclusive, irrevocable, worldwide right and license to the artwork and trademarks created by H5G as part of the H5G-IGT Games to use, make, have made, offer for sale, sell, import, reproduce, modify, create derivative works of, publicly display, publicly perform, distribute (through multiple tiers of distribution), and otherwise exploit such artwork and trademarks for any purpose other than use within a casino-style slot game.

19.     By definition, the H5G-IGT Games, as used in the Settlement Agreement, include "all games listed on Exhibit A through Exhibit D," which expressly included the casino-style slot games "Golden Goddess" and "Cats."

20.     The Settlement Agreement modified the rights of the Parties after January 1, 2016, and with the exception of the specifically identified phase-outs of pre-existing license rights, the Settlement Agreement modified such pre-existing license rights to rights that granted each respective Party the rights it required to continue its business.

21.     The Settlement Agreement expanded the rights of H5G, contained in Section 9(e), *infra*, as compared to the previous license rights granted under the 2012 Agreement for artwork and trademarks for any use not in "a Field of Game Play."

22.     In accordance with the Settlement Agreement, H5G's only restriction on its use of artwork and trademarks was "within a casino-style slot game."

23.     Section 9(e) of the Settlement Agreement granted H5G the irrevocable and non-exclusive license rights to use the artwork and trademarks of certain games, including but not limited to "Golden Goddess," "DaVinci Diamonds," and "Cats" slot games in connection with H5G's social casinos.

24.     Many of H5G's uses of its license rights grant H5G the license rights to use certain artwork and trademarks "within a casino-style slot game," despite such license right not being granted in Section 9(e).

25.     Similarly, Sections 9(b), (c), and (d) of the Settlement Agreement also provide affirmative license rights.

26.     Section 9(f) of the Settlement Agreement mandates that the licenses granted to H5G under any trademarks are subject to the further following conditions:

    i.    All such uses must identify such trademarks as being owned IGT and used under license using the following language "[trademark name] trademark(s) and copyrights are owned and/or registered by IGT in the U.S. and/or other countries and used under license from IGT."

    ii.    As between the Parties, IGT shall have the sole right, but not the obligation, in its sole discretion and at its sole cost, to apply for registration, register, maintain, renew, abandon, and enforce all rights in such trademarks and associated registrations or applications.  H5G will cooperate with IGT with respect to all such activities as reasonably requested by IGT from time to time and IGT will reimburse any reasonable costs that H5G incurs in connection with such cooperation.  All goodwill in the trademarks generated through use of them will inure to the sole benefit of IGT.

    iii.    Before using any of the trademarks in commerce or otherwise publicly displaying their intended use, H5G must submit a representative sample or mockup of the expected usage to IGT, c/o Intellectual Property Department at the address listed in the notice listed in the notice provision below for approval, **such approval not to be unreasonably withheld**.  If IGT does not object to any proposed use within twenty (20) days after receipt by IGT, then IGT shall be deemed to have approved such use.  IGT may refuse or revoke its approval or deemed approval **if at any time it reasonably believes** that the usage is or will be impairing, prejudicing, or diluting IGT's rights in the trademarks or the reputation of IGT or any of its Affiliates… H5G will submit samples of approved trademark uses **as reasonably requested by IGT** from time to time for purposes of determining conformance with the terms of this trademark license for purposes of quality control.  H5G shall use the trademarks only in connection with reputable goods and services of reasonably high quality.  (*emphasis added*)

*Post 2016 Settlement Agreement Course of Business*

    27.    In 2017, H5G increased the number of social casinos, developed and launched among others, Golden Goddess Casino and Cats Casino, both being social casino products, which respectively continued to utilize the artwork and trademarks of the Golden Goddess and Cats slot games for promotion and branding.  In 2018, H5G developed and launched DaVinci Diamonds Casino, a social casino product, which utilizes artwork and trademarks of the DaVinci Diamonds

slot games for promotion and branding.  None of these social casinos include or contain any of the Selected Games within any of the casinos.

28.    Each of Golden Goddess Casino, DaVinci Diamonds Casino, and Cats Casino only allow a player to select from a limited number of casino-style games, which are all casino-style slot games.

29.    On Golden Goddess Casino, for example, the available casino-style slot games include those with Grecian themes, having the titles: "Tales of Hercules," "Ancient Arcadia," "The Mighty Atlas," "Legend of Troy," "The Three Graces," and "Platinum Goddess."

30.    On Cats Casino, the available casino-style slot games are cat-themed, having the titles: "Sapphire Tiger," "Purr a Few Dollars More," "Realm of the Sabercat," "Liger Loot," "Cat Gangster," and "Majestic Cats."

31.    On DaVinci Diamonds Casino, the available casino-style slot games have the titles: "Double DaVinci Diamonds," "Michelangelo," "Empress of the Nile," "Moonlight Rainbow," "Miss Universe: Crowning Moment," "Les Belles Nouveau," "Da Vinci Ways," "White Lion," "Venice Masquerade," "Magnificent Jewels," "Jewels of India," "House of Jewels," "Secrets of Da Vinci," "Da Vinci's Mona Lisa," "Princess Romanov," "Shadow Diamond," "Kiss of the Rose" and "Amulet and the Charm."

32.    H5G does not utilize the casino-style slot games "Golden Goddess," DaVinci Diamonds" or "Cats" in any capacity on any of its social casinos.  Similarly, H5G does not utilize the trademarks "Golden Goddess" or "Cats" in any capacity within a casino-style slot game.  H5G does use the trademark "DaVinci Diamonds" in the expressly licensed Previously Accepted Game "Double DaVinci Diamonds," which IGT has licensed to H5G exclusively for certain markets.

H5G does not use the trademark "DaVinci Diamonds" in any other capacity within a casino-style slot game.

*Activities Giving Rise to this Action*

33.    In 2017, several months before IGT filed its complaint against H5G [Dkt. No.: 1:17-cv-09792, "Related Action"], IGT sold its ownership of Double Down Interactive, LLC ("Double Down"), which owned Double Down Casino, the technology and database information associated therewith, as well as other minor assets, to a Korean-based gaming company, DoubleU Games,  LLC (alone as "DoubleU," and inclusive of one of more of its affiliates and/or subsidiaries, including DoubleDown, as "DoubleU Group"), for $825 million and  upon information and belief, granted **<u>exclusive</u>** license rights to the DoubleU Group  to a set of IGT's intellectual property, including the trademarks and artwork of Golden Goddess, DaVinci Diamonds and Cats slot games, to which non-exclusive license rights were granted to H5G in the Settlement Agreement (IGT's sale of Double Down and the associated license agreement are collectively referred to herein as the "Transaction")

34.    As noted in public, published investor documents, in addition to paying IGT $825 Million for ownership of Double Down Casino and its related assets, IGT required a subsequent "Games Development and Distribution Services Agreement" be executed in order for IGT's slot games to be distributed through Double Down Casino under the new ownership.

35.    Based on the irrevocable, non-exclusive license rights of certain trademarks and artwork, previously granted to H5G per the Settlement Agreement, and the subsequent grant of these same license rights to Double Down and/or DoubleU and/or their affiliate(s), **<u>on an exclusive basis</u>**, IGT's license to DoubleU and/or their affiliates is inherently invalid, at least in part, as IGT did not have exclusive rights to artwork and trademarks to the Selected Games to grant. Upon

11

information and belief, DoubleU and/or its affiliate would have a valuable claim against IGT for its inability to grant the exclusive license rights as set forth in the Transaction.

36.     Upon information and belief, DoubleU Group, and in particular, Double Down, through its officers, directors, and/or fiduciary agents, have actual knowledge of the entirety of the contents of the Settlement Agreement, and in particular, H5G's license rights to IGT's intellectual property in Section 9(a), *et seq.*

37.     Upon information and belief, the Transaction included a right whereby DoubleU could demand IGT pursue litigation against someone using intellectual property exclusively licensed to DoubleU.  Upon further information and belief, the Related Action was commenced by IGT in light of DoubleU's rights to demand such action be taken.

38.     On December 14, 2017, IGT filed its Complaint in the Related Action, alleging: (I) Federal Trademark Infringement; (II) Federal Unfair Competition; (III) Breach of Contract; and (IV) Deceptive Acts and Practices – General Business Law § 349, 350 and 350-1.

39.     On December 26, 2017, IGT filed a motion for Preliminary Injunction, seeking to enjoin H5G from its use of "Golden Goddess Casino," "DaVinci Diamonds Casino," and "Cats Casino," as IGT alleged such social casino products were  "casino-style slot games."

40.     On January 17, 2018, at the conclusion of oral argument in the related action concerning IGT's motion for preliminary injunction, the Court indicated H5G's use of the Golden Goddess and Cats' artwork and Trademarks within social casino apps, was a permitted use per Section 9(e) of the Settlement Agreement.  Note: at the time of this oral argument, DaVinci Diamonds Casino was not yet published by H5G, and was not part of IGT's claims.

41.     On April 18, 2018, after supplemental oral argument stemming from IGT's Preliminary Injuction motion, and after clarification from the Court, an Order was eneterd required

H5G to submit all uses of Golden Goddess, DaVinci Diamonds and Cats trademarks, including those on the social casino apps, to IGT in accordance with Section 9(f) of the Settlement Agreement.

42.     On the same day as the Order, and over the following weeks, H5G submitted a multitude of samples to IGT that showing H5G's use and proposed uses of trademarks licensed under Section 9(e), in association with goods/services permitted by 9(e).  In response, IGT provided canned answers, repeated for many of the samples despite the samples being significant and distinctively different, and none reflecting any modicum of fact-based analysis, showing IGT's concerns or relevant issues with H5G's proposed use, such that any reasonable person, or a Court of competent jurisdiction, could agree that IGT's legal conclusions and withholding of approval for each of the samples is reasonable.

43.     On May 2, 2018, H5G sent IGT a response to its unreasonable withholding of approval for all 196 samples submitted to IGTA true copy of H5G's letter to IGT, hereto annexed as *Ex. B*.  H5G granted IGT an opportunity to modify its responses and express a reasonable basis, and H5G requested IGT notify H5G whether it intends to modify its responses or not by March 4; if so, H5G offered to meet and confer with IGT on a reasonable time frame in which IGT could submit its modified responses.  As of May 9, 2018, IGT has not submitted modified responses to H5G, and has not given H5G any indication that it intends to do so.

44.     IGT has breached the Settlement Agreement insofar as IGT repeatedly fails to adhere to Section 9(f), which bars IGT from unreasonably withholding consent to use certain trademarks in commerce or otherwise publicly displaying their intended use. H5G has provided IGT notice of its unreasonableness, and as a courtesy, allowed IGT an opportunity to mitigate its unreasonableness, however, IGT desires to maintain its highly unreasonable positions.

45.     By unreasonably withholding consent, and providing a clear indication that it does not have any intentions of approving any submitted proposed use by H5G of permitted trademarks irrevocably licensed to H5G under Section 9(e) for use in connection with permitted goods/services under Section 9(e), IGT is unlawfully attempting to modify H5G's license rights under the Settlement Agreement. Insofar as IGT attempts to revoke or render null, either actively or constructively, H5G's license rights to the artwork and trademarks of the Selected Games under Section 9(e), IGT has breached Section 9(e) of the Settlement Agreement.

46.     IGT has further breached the Settlement Agreement insofar as the Complaint filed and currently pending in the Southern District of New York, *IGT v. High 5 Games, LLC*, Docket. No. 1:17-cv-09792, is improper as it seeks relief for actions related to the acts released in accordance with Section 3 of the Settlement Agreement.  On April 26, 2018, H5G filed its  Motion to Dismiss IGT's Amended Complaint in lieu of an Answer pursuant to Fed. R. Civ. P. § 12(b)(6). This dispositive motion remains pending.[1]  In its Motion to Dismiss, H5G clearly articulates its basis for why IGT's claims in its Complaint in the Related Action are fully released by the Settlement Agreement, and IGT is on notice of the same.  Despite such knowledge, IGT continues to maintain such claims, and as such, has willfully breached Section 3 of the Agreement.

47.     In light of  Upon information and belief,  the DoubleU Group, and in particular, Double Down, has tortiously interfered with the Settlement Agreement, and continues to tortuously interfere with the Settlement Agreement, insofar as Double Down had knowledge of the existence of this valid contract between H5G and IGT, and with this knowledge, Double Down

---

[1] As the Motion to Dismiss is pending, and H5G has not filed any responsive pleading in the related action, the causes of action as against IGT herein, and the cause of action against Double Down, cannot at this time be plead as Counterclaims and a third-party complaint, respectively.

tortiously, knowingly, willfully and intentionally procured a breach of this contract by demanding IGT violate H5G's rights thereunder, and as a result, H5G has sustained damages.

**COUNT I AGAINST IGT**
**BREACH OF CONTRACT**

48.     H5G hereby realleges, as if fully set forth, the allegations contained in  paragraphs 1-47 of the Complaint.

49.     The Settlement Agreement is a valid and enforceable contract.

50.     IGT has committed a number of uncured, material breaches of the Settlement Agreement.

51.     Section 9(f) of the parties' Settlement Agreement requires that H5G seek approval from IGT upon the submission of representative samples and mock-ups, "whereby such approval [is] not to be unreasonably withheld." *See Ex. A.*

52.     In accordance with the obligations set forth in the Settlement Agreement, Section 9(f), H5G has submitted the requisite samples for IGT's approval.

53.     On March 22, 2018, H5G, pursuant to Section 9(f)(iii) of the Settlement Agreement, submitted Requests numbered 000001-000125, seeking approval of H5G's proposed use of certain IGT trademarks.

54.     On April 10, 2018, IGT provided a blanket, unreasonable denial of all but two submissions for H5G's proposed use of the trademarks.

55.     On April 13, 2018, IGT revoked the deemed approval of Requests numbered 000054 and 000072.

56.     On April 11, 2018, Requests numbered 000126 – 000170 were submitted to IGT pursuant to Section 9(f)(iii) of the Settlement Agreement, and IGT responded with both deemed approvals and unreasonable denials of all submissions for H5G's proposed use of the trademarks.

57.     April 18, 2018, Requests numbered 000171 – 000196 were submitted to IGT pursuant to Section 9(f)(iii) of the Settlement Agreement.

58.     On April 20, 2018 IGT provided a blanket, unreasonable denial of all submissions for H5G's proposed use of the trademarks.

59.     IGT has failed to provide a reasonable basis as to the denial of all submissions, which is required by Section 9(f)(iii) of the Settlement Agreement.

60.     IGT provided the following, near identical, responses to H5G's submissions for Matter Nos. [000016]-[000017] and [000073]-[000125]:

> Not approved.  This trademark is subject to the Preliminary Injunction and enjoined by the Court.  IGT Objects to the use of this trademark for the reasons set forth in its Motion for Preliminary Injunction.

61.     Thus, IGT has failed to evaluate H5G's proposed uses on the merits of each of the individual proposed uses, as is required under the Settlement Agreement, and the blanket denials are *de facto* examples of IGT's unreasonableness and breach of IGT's obligations under Section 9(f)(iii) of the Settlement Agreement.

62.     For Matter Nos. [000171]-[000184] and [000186]-[000196], IGT unreasonably refused approval, providing the following response:

> Not approved.  IGT objects to the "intended" use of the IGT trademarks in this request for the reasons set forth in its Motion for Preliminary Injunction, including that this use of IGT's trademarks uses the goodwill associated with IGT's marks to divert players to non-IGT games, websites, and/or apps.  IGT also has a reasonable belief that H5G's proposed "intended" use of the trademarks impairs, prejudices, and dilutes IGT's trademark rights and reputation.  In addition, the proposed "intended" use of the trademark includes styles of marks and artwork that are confusingly and substantially similar to IGT's uses of the same trademarks on similar or related types of products.  H5G is required to comply with all subsections of Section 9(f).

63.     IGT's response to H5G's submission of Matter Nos. [000171]-[000184] and [000186]-[000196], fails to provide a reasonable basis for withholding approval as proscribed by

Section 9(f)(iii).  IGT's claim of impairment or prejudice is factually unsupported and fails to articulate how the legal conclusions of impairment, prejudice and dilution are reasonable believed to exist.

64.     IGT has expressly licensed the trademarks of Golden Goddess, Cats and Davinci Diamonds to H5G for all uses, except "within a casino-style slot game" and IGT has failed to present any evidence that H5G's proposed uses would harm IGT's marks wherein H5G indeed has an irrevocable, non-exclusive license to use the trademarks as submitted in its representative samples.

65.     IGT is preventing H5G's enjoyment of the benefits negotiated within the Settlement Agreement.

66.     IGT's denial of each and every use of the trademarks is unreasonable and in breach of Section 9(f)(iii) of the Settlement Agreement.

67.     Accordingly, IGT has failed to comply with the terms of the contractual obligations set forth in the Settlement Agreement.

68.     IGT's breach is, and was, material.

69.     IGT has failed to cure its breaches.

70.     H5G has met its obligations owed under the Settlement Agreement.

71.     IGT's acts have been undertaken with full knowledge of H5G's rights as enumerated in the Settlement Agreement.

72.     Accordingly, IGT is liable to H5G for breach of the parties 2016 Settlement Agreement.

73.     IGT has breached the Settlement Agreement in filing the Complaint in the related action, *IGT v. High Five Games, LLC, Dkt. No. 1:17-cv-09792,* as litigating the causes of action

17

set forth in the related action are in violation of Section 3(b) of the Settlement Agreement, which

states that the Releasing Parties – IGT and H5G –:

> [m]ay have sustained Losses that are presently unknown and unsuspected, and that such Losses as may have been sustained **may give rise to additional Losses in the future**. The parties further acknowledge that they have negotiated this Settlement Agreement taking into account presently unsuspected and unknown Losses, and the parties voluntarily and with full knowledge of its significance, expressly waive and relinquish any and all rights the Releasing Parties may have under any statute, rule, or common law principle, in law or equity, **relating to** limitations on general releases and **such Losses**. *(emphasis added) See Ex. A, Section 3(d).*

> The parties define "Losses" as:
> [a]ny and all manner of actions, causes of action, suits, claims, demands, judgments, liabilities, debts, damages, losses, costs, expenses, judgments, awards, interest, compensation, and proceeds, whether based in tort, contract, strict liability or other theory, arising in law or in equity, fixed or contingent, known or unknown, foreseeable or not, certain or contingent, disclosed or undisclosed, or asserted or not. *See Ex. A, Section 3(a).*

74.    The released subject matter of paragraph 3(a) of the Settlement Agreement,

describes with respect to the released "Losses":

> in each case, that any Releasing Person and their Affiliates had, now has or may have had or may hereafter discover without regard to the subsequent discovery or existence of different or additional facts against Released Persons related to the Allegations, Litigation, or 2012 Agreement, including the financial audits of each party. *Id.*

75.    Thus, the contemplation of future acts by H5G related to the acts released (i.e.,

related to the Allegations and Litigation), was clearly considered and ultimately included in the

Settlement Agreement, as it specifically states that the Losses that existed as of January 1, 2016,

"may give rise to additional Losses in the future."

76.    The contemplation of future acts by H5G related to the acts released (i.e., related to

the Allegations and Litigation), was clearly considered and ultimately included in the Settlement

Agreement, as it specifically states that the Losses that existed as of January 1, 2016, "may give

rise to additional Losses in the future."

77.     Pursuant to Section 3(b) of the Settlement Agreement, based on IGT's filing of its Complaint in the related action, H5G is entitled to all attorneys' fees incurred in the defense of that action.   Section 3(b) states:

> Each party shall indemnify the other party and hold the other party harmless from and against any and all Losses, including without limitation attorneys' fees and all amounts paid in settlement of any claim, action or suit, incurred by the other party as the result of any Releasing Person asserting a claim released by this Settlement Agreement or an interest in any claim released by this Settlement Agreement, whether such interest was acquired by assignment, transfer, by operation of law or otherwise.

78.     Based on IGT's litigation of related matters, as released by the Settlement Agreement, and contemplated in the Settlement Agreement, H5G is entitled to the reimbursement of attorneys' fees, costs, damages, and other damages permitted by law, and expressly provided in Section 3(b) of the Settlement Agreement.

79.     H5G has been materially harmed and damaged as a result of the breaches by IGT. A monetary remedy alone cannot adequately compensate H5G, and thus, H5G is entitled to an award of specific performance of the Settlement Agreement.

80.     H5G seeks monetary damages in an amount to be proven at trial.

## COUNT II AGAINST IGT
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

81.     H5G repeats and realleges the allegations contained in paragraphs 1 through 80 as fully set forth herein.

82.     The implied covenant of good faith and fair dealing applies to all contracts, and requires each contracting party to deal fairly and in good faith with all other contracting parties.

83.     Arising from the Settlement Agreement between IGT and H5G, IGT breached its covenant of good faith and fair dealing to H5G.

84.     As set forth more fully above, under Section 9(e) of the Settlement Agreement, IGT granted to H5G a very broad and irrevocable license to use certain marks and artwork ("Irrevocable License").

85.     After issuing the Irrevocable License to H5G for valuable consideration, IGT attempted to revoke and constructively revoked the Irrevocable License, unreasonably withholding consent, and providing no indication that any use of the Irrevocable License by H5G, as it pertains to trademarks at issue in this lawsuit, will ever be permitted.  IGT's actions are an attempt at modifying H5G'srights to use certain marks and artwork in a manner permitted, that are subject of the Irrevocable License.

86.     Upon information and belief, IGT attempted to revoke and constructively revoked the Irrevocable License issued to H5G in favor of unlawfully issuing a subsequent exclusive license for, among other things, the same marks and artwork to H5G's competitor and IGT's progeny Double Down Interactive, LLC.

87.     These actions by IGT are acts demonstrating IGT's breach of good faith and fair dealing, and have caused, and continue to cause, substantial damages to H5G.

88.     H5G seeks monetary damages in an amount to be proven at trial.

## COUNT III AGAINST IGT
## UNJUST ENRICHMENT

89.     H5G hereby realleges, as if fully set forth, the allegations contained in  paragraphs 1-88 of the Complaint.

90.     IGT blatantly disregarded H5G's irrevocable, non-exclusive license to the artwork and trademarks at issue in the related action, in its granting of an exclusive license to the same rights to certain artwork and trademarks, for a significant sum to the DoubleU Group.

91.     IGT, in granting these subsequent exclusive rights to the DoubleU Group, despite H5G's irrevocable, non-exclusive license to the same artwork and trademarks, has created an equitable unjust enrichment to IGT.

92.     IGT was enriched at the expense of H5G, and IGT's retention of the benefit is unjust.

93.     The Settlement Agreement was negotiated by both parties, represented by counsel, and mutually agreed to by the contracting parties.

94.     The circumstances are such that equity and good conscience require IGT to make restitution.

95.     IGT's conduct of subsequently granting a third party exclusive rights, that were already granted in an irrevocable, non-exclusive manner to H5G, was malicious, deliberate and willful.

96.     As such, H5G has been damaged as a direct and proximate result of IGT's malicious, deliberate and willful acts, and resulting unjust enrichment.

97.     As a result of IGT's complete disregard of H5G's licensed rights, H5G is being harmed reputationally, as IGT and the DoubleU group have publicly announced and advertised their exclusive licensing arrangement, and IGT is being unjustly enriched.

98.     As a result of IGT's unreasonable and blanket denials of all of H5G's submissions of samples, made in compliance with Section 9(f)(iii) of the Settlement Agreement, H5G is being harmed in the operation of its business, as it is unable to use artwork and trademarks that it indeed has the license to use. Thus, H5G is being harmed economically as a result of IGT's obstruction, and H5G is thus unable to launch, market, distribute any new games, notifications, etc. using the trademarks and artwork at issue.

99.     As a result of IGT's continued attempts to negate the express license rights of H5G, and disavow their existence, as it pertains to the trademarks and artworks at issue, H5G continues to be harmed, and IGT is being unjustly enriched.

100.    Wherefore, H5G seeks damages to be proved at trial.

**COUNT IV AGAINST DEFENDANT IGT
DECLARATORY JUDGEMENT OF COPYRIGHT INVALIDITY**

101.    H5G hereby realleges, as if fully set forth, the allegations contained in  paragraphs 1-100 of the Complaint.

102.    IGT claims to have received U.S. Copyright Registration VA 2-082-268, titled GOLDEN GODDESS GAMING MACHINE for 2-D artwork.

103.    IGT claims to have received U.S. Copyright Registration VA 2-082-956, titled CATS GAMING MACHINE for 2-D artwork.

104.    IGT claims to have received U.S. Copyright Registration VA 2-084-417, titled DAVINCI GAMING MACHINE.

105.    The certificates of a copyright registration, and the submitted images, are not available to the public.

106.    IGT has failed to provide the above-referenced certificates for copyright registration.

107.    In the related action, *IGT v. High Five Games, LLC, Dkt. No. 1:17-cv-09792,* IGT does not provide what single 2-D images were purportedly submitted in connection with its Copyright Registrations.

108.    There are over 30 images provided in the First Amended Complaint in the related action, *IGT v. High Five Games, LLC, Dkt. No. 1:17-cv-09792,* as to Golden Goddess, Cats and

DaVinci Diamonds, yet IGT alleges that only three images are protected by Federal Copyright Registration.

109.    The thirty (30) images provided in IGT's First Amended Complaint provide no guidance or specificity whatsoever as to what was submitted for copyright registration, and therefore, what constitutes the basis of IGT's copyright infringement claim, therein.

110.    IGT, in the related action, *IGT v. High Five Games, LLC, Dkt. No. 1:17-cv-09792*, has failed to disclose what images possesses copyright protection.

111.    A Public Catalog can be accessed within the Copyright Office, which provides minimal detail as to a copyright certification.

112.    Under Registration VA 2-084-417 for DAVINCI DIAMONDS GAMING MACHINE, the "Authorship on Application" indicates that the author of the work was an employer for hire.  This is a misrepresentation as the author was not an employer for hire.

113.    Similarly, under Registration VA 2-082-956 for CATS GAMING MACHINE, the "Authorship on Application" indicates that the author of the work was an employer for hire.  This is a misrepresentation as the author was not an employer for hire.

114.    Similarly, under Registration VA 2-082-268 for GOLDEN GODDESS GAMING MACHINE, the "Authorship on Application" indicates that the author of the work was an employer for hire.  This is a misrepresentation as the author was not an employer for hire.

115.    Pursuant to the Public Catalog for the copyright registrations at issue, IGT failed to disclose that it is not the owner of the original work.

116.    The stock art for the images related to these purported copyright registrations is owned by Getty.

117.    IGT had and has knowledge that the images are owned by Getty Images and IGT failed to acknowledge the source of the work.

118.    IGT also failed to submit the original photographs that IGT's images are based upon.

119.    IGT has omitted material facts regarding the copyrighted work in order to obtain its copyright registrations, and the validity of ownership is fraudulent.

120.    IGT has submitted factual misrepresentations and inaccuracies to the Copyright Office for malicious purposes of quickly obtaining copyright registrations to use in a federal lawsuit against H5G.

121.    Copyright registration creates a rebuttable presumption that all facts stated within the submission to Copyright Office are true, however the facts submitted by IGT to the Copyright Office are false.

122.    IGT cannot enjoy the protections of copyright registration as to the alleged copyrighted work.

123.    IGT's willful misrepresentations renders the copyright registrations invalid.

124.    Wherefore, H5G seeks a declaration that IGT's ownership of the copyrights at issue are invalid.

## COUNT V AGAINST DOUBLE DOWN INTERACTIVE, LLC
## TORTIOUS INTERFERENCE

125.    H5G repeats and realleges the allegations contained in paragraphs 1 through 124 as fully set forth herein.

126.    IGT and H5G entered into a valid contractual agreement, referred herein as the Settlement Agreement, effective January 1, 2016.

127.   Upon information and belief, Double Down is a subsidiary of Double U.

128.   Upon information and belief, in 2017, IGT entered into a contractual agreement whereby IGT granted certain exclusive license rights to Double Down and/or DoubleU and/or their affiliates for the use of certain trademarks and artwork.

129.   IGT, as a party to the Settlement Agreement, was fully aware of the existence of its Settlement Agreement with H5G, wherein IGT granted irrevocable, non-exclusive licensing rights to H5G for the use of certain trademarks and artwork.

130.   IGT knowingly entered into a contractual agreement with Double Down and/or DoubleU and/or their affiliates with knowledge that the provisions of this subsequent contract created a breach of the contractual provisions contained within the already existing Settlement Agreement.

131.   Joseph A. Sigrist is the Senior Vice President & General Manager of Double Down Interactive, LLC.

132.   Double Down is a former affiliate of IGT.

133.   In 2017, IGT sold Double Down to DoubleUGames Co., Ltd.

134.   In 2017, Double Down was granted a license to use IGT's trademarks including Golden Goddess, Cats and DaVinci Diamonds, and intellectual property related to casino-style slot games using these marks, for social gaming.

135.   Double Down offers certain IGT casino-style slot games, including Golden Goddess, Cats and DaVinci Diamonds for social gaming through the Double Down Casino website and mobile phone app.

136.    The grant of these exclusive license rights to Double Down was improper as these rights were already granted by IGT to H5G as irrevocable and non-exclusive in the Settlement Agreement.

137.    Double Down was aware of the 2016 Settlement Agreement by and between H5G and IGT at all relevant times, including at the time that IGT granted certain exclusive license rights to Double Down and/or DoubleU and/or their affiliates for the use of certain trademarks and artwork, including but not limited the those Exclusive IGT Games listed on Ex. C of the Settlement Agreement. *See Ex. A.*

138.    Double Down intentionally induced IGT to breach its contract with H5G, *i.e.* the Settlement Agreement.

139.    As a result of Double Down's procurement of this breach of contract, H5G has suffered irreparable damages both reputationally and economically.

140.    Wherefore, H5G seeks damages to be proved at trial.

**COUNT VI AGAINST ALL DEFENDANTS**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

141.    H5G repeats and realleges the allegations contained in paragraphs 1 through 140 as fully set forth herein.

142.    As more fully stated above, IGT has conducted business with H5G for over fifteen years. As such, upon information and belief, IGT knows that H5G had, and has, ongoing and prospective business relationships with current and prospective H5G customers.

143.    Double Down is one of H5G's direct competitors, both Double Down and H5G are competing with each other for market share within the same and related market segments of industry, namely, social casino products. As such, upon information and belief, Double Down

knows that H5G had, and has, ongoing and prospective business relationships with current and prospective H5G customers.

144.    Upon information and belief, IGT and Double Down knew that H5G obtains and maintains current and prospective customers through, among other things, the development, marketing, sale, and deployment for use of unique gaming applications.

145.    Upon information and belief, IGT and Double Down knew that the development, marketing, sale, and deployment for use of H5G's unique gaming applications was, and is, predicated upon H5G's Irrevocable License to use certain marks and artwork.

146.    Upon information and belief, IGT and Double Down knew that by attempting to revoke, and constructively revoking, the Irrevocable License, IGT would, and did, interfere with H5G's ability to maintain business relationships with H5G's existing customers.

147.    Upon information and belief, IGT and Double Down knew that by attempting to revoke, and constructively revoking, the Irrevocable License, IGT would, and did, interfere with H5G's ability to fairly compete with Double Down, particularly where IGT has unlawfully issued an exclusive license for the same marks and artwork to Double Down.

148.    Upon information and belief, IGT and Double Down knew that by Double Down inducing IGT to attempt to revoke, and constructively revoke, the Irrevocable License, IGT would, and did, interfere with H5G's ability to fairly compete with Double Down, particularly where IGT has unlawfully issued an exclusive license for the same marks and artwork to Double Down.

149.    As a result, H5G has been damaged by IGT's and Double Down's tortious interference with H5G's business relationships, where H5G seeks damages in an amount to be proved at trial.

## DEMAND FOR JURY TRIAL

H5G hereby demands a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, H5G demands judgment:

(a) On its First Cause of Action, awarding H5G specific performance by IGT of the provisions set forth under the Settlement Agreement, and economic damages in an amount to be determined at trial, plus interest, reasonable costs, and attorneys' fees, plus any other damages, costs, fees, etc., as permitted by Section 3(b) of the Settlement Agreement;

(b) On its Second Cause of Action, awarding H5G economic damages in an amount to be determined at trial, plus interest, reasonable costs, and attorneys' fees;

(c) On its Third Cause of Action, awarding H5G economic damages and punitive damages in an amount to be determined at trial, plus interest, reasonable costs, and attorneys' fees;

(d) On its Fourth Cause of Action, awarding H5G declaratory judgment on its claim for copyright invalidity;

(e) On its Fifth Cause of Action against Double Down, awarding H5G economic damages and punitive damages in an amount to be determined at trial, plus interest, reasonable costs, and attorneys' fees;

(f) On its Sixth Cause of Action against both defendants, awarding H5G economic damages and punitive damages in an amount to be determined at trial, plus interest, reasonable costs, and attorneys' fees;

(g) For such other relief as this Court may deem just and proper.

Dated:      New York, New York
             May 10, 2018

By:    */s Margot Wilensky*
Margot Wilensky (MW-3181)
HAWORTH ROSSMAN & GERSTMAN, LLC
45 Broadway, 21st Floor
New York, New York 10006
Telephone: (212) 952-1100
Facsimile: (212) 952-1110
Email: margot.wilensky@hrglawfirm.com
*Attorneys for Plaintiff*
*High 5 Games, LLC*